# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| | ) | Case No.    1:19MJ347-1 |
| All funds on deposit up to a total of $102,487.50 in Pentagon Federal Credit Union Money Market Savings account number ending in 8036, in the name of Willie D. Cain | ) | |
| | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Middle_____ District of

___North Carolina___ is subject to forfeiture to the United States of America under __18__ U.S.C. §

**981(a)(1)(C) and** *(describe the property)*:
18 U.S.C. § 982(a)(7)

All funds on deposit up to a total of $102,487.50 in Pentagon Federal Credit Union Money Market Savings account number ending in 8036, in the name of Willie D. Cain

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

George Earl Boyles, Special Agent, VA-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___10/29/19 1:45 PM___

_____
*Judge's signature*

City and state: ___Durham, NC___

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEIZURE WARRANTS

I, George Earl Boyles, a Special Agent with the United States Department of Veterans Affairs, Office of Inspector General, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Department of Veterans Affairs (VA), Office of Inspector General (OIG), currently assigned to Fayetteville, North Carolina and have been so employed since March 2010. I am responsible for felony investigations of crimes impacting the programs, operations, and/or property of the VA.   That responsibility includes investigating Healthcare Fraud, Wire Fraud, Mail Fraud and Theft of Government Funds, which occur in the Middle District of North Carolina.   I was previously employed as a Special Agent for the United States Army Criminal Investigation Command for ten years, serving in various locations including the United States Army Installation, Fort Bragg, in Fayetteville, North Carolina.  My responsibility there was the investigation of felony crimes having nexus to the United States Army and included Economic Crimes investigations.  I have participated in over 150 felony criminal investigations.

2.     As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

3.     I am investigating the activities of Willie D. CAIN, who resides at 1250 Colts Pride Drive, Fayetteville, North Carolina 28312.  As will be shown below, there is probable cause to believe that Cain fraudulently obtained VBA benefit payments which were deposited into his bank account on a regular and recurring basis, or paid to or for his benefit through checks and payments to third party vendors, in violation of Title 18, United States Code, Section 1347 and Title 18, United States Code, Section 641.

4.     I submit this affidavit in support of applications for warrants to seize the following properties:

   a.   Funds on deposit in the amount of up to $66,848.61 in Pentagon Federal Credit Union Access America Account ending in 5024 in the name of Willie D. Cain;

   b.   Funds on deposit in the amount of up to $102,487.50 in Pentagon Federal Credit Union Money Market Savings Account ending in 8036 in the name of Willie D. Cain;

   c.   2018 Toyota Sienna, VIN 5TDYZ3DC3JS965691; and

   d.   Golden Technologies motorized wheelchair/scooter, Model: Companion, GC340.

Based on the investigation described in this Affidavit, there is probable cause to believe that these properties constitute or are derived from proceeds traceable to the commission of a Federal health care offense or other "specified unlawful activity" (as defined in 18 U.S.C. §1956(c)(7) (including violations of 18 U.S.C. §§ 1347 and 641)), and are therefore subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1(C) and 982(a)(7).

5.     The information contained in this affidavit is based on my training and experience, as well as information developed during a criminal investigation of Cain's activities. Because this affidavit is being submitted for the limited purpose of securing seizure warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts I believe are necessary to establish probable cause to believe that the properties described in paragraph 4 above are subject to seizure and forfeiture.

2

## STATUTORY AUTHORITY

6.      This investigation concerns alleged violations of Title 18, United States Code, Section 1347, health care fraud, and Title 18, United States Code, Section 641, theft of public money, property or records.

a.      Title 18, United States Code, Section 1347 prohibits (a) knowingly and willfully executing, or attempting to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program. A violation of Section 1347 is a "Federal health care offense" pursuant to Title 18, United States Code, Section 24(a).

b.      Title 18, United States Code, Section 24(b) defines a "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

c.      Title 18, United States Code, Section 641 prohibits embezzling, stealing, purloining, or knowingly converting to his use or the use of another, or without authority, selling, conveying or disposing of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; and from receiving, concealing, or retaining the

3

same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted.

**Relevant VA Programs and Services**

7.     The VA operates the nation's largest integrated health care system, with more than 1,700 hospitals, clinics, community living centers, domiciliaries, readjustment counseling centers, and other facilities. A VA Regional Office is situated at 251 N. Main St., Winston-Salem, NC 27155 (Winston-Salem VARO). The Winston-Salem VARO processes approximately 64,000 disability-related claims per year, including the claims submitted by Willie D. CAIN at all times relevant to this investigation.

8.     The Veterans Benefit Administration (VBA) is an agency of the VA responsible for administering programs that provide financial and other forms of assistance to veterans, their dependents, and survivors. Major benefits include veterans' compensation, veterans' pension, survivors' benefits, rehabilitation and employment assistance, education assistance, home loan guaranties, and life insurance coverage.

9.     VA Disability Compensation is a benefit paid to a veteran because of injuries or diseases that happened while on active duty or were made worse by active military service.

10.     Aid & Attendance (A&A) is an additional VA payment, supplementing the VA pension, available to veterans requiring a higher level of regular care provided by another person or facility. Examples of "higher level of care" cited in 38 C.F.R. § 3.352 include "inability of claimant to dress or undress himself," "frequent need of adjustment of any special prosthetic or orthopedic appliances," "inability to attend to the wants of nature," and "permanently bedridden."

4

The need for A&A means helplessness or being so nearly helpless as to require the regular "aid and attendance" of another person.

11.     A variety of additional benefits are available through the VA Rehabilitation and Prosthetic Services division, which is responsible for policies and programs for medical rehabilitation, and prosthetic and sensory aids services that promote the health, independence and quality of life for Veterans with disabilities. Available benefits include but are not limited to home improvements and structural alterations, the purchase and adaptation of vehicles, clothing allowances, and the purchase of mobility devices.

## **PROBABLE CAUSE**

VA Benefits and CAIN's Disability Claims

12.     On September 7, 2017, VA-OIG received a report that CAIN had grossly exaggerated his claim of service-connected disability in order to obtain increased monthly benefit payments from the VA. The report came from CAIN's estranged wife, who said that although CAIN claimed loss of use of his lower extremities, he was able to walk and carry out regular daily activities. [CAIN and his wife separated on or about February 11, 2017, and divorced on or about November 8, 2018.]

13.     On September 12, 2017, I conducted a query of a VBA database (SHARE), and determined the following regarding CAIN's VA benefits:

    a.     Cain was listed as 100% Service Connected for multiple conditions;

    b.     Effective October 1, 2009, CAIN's monthly benefit increased from $2,919 per month to $6,819 per month;

    c.     As of December 1, 2016, CAIN began receiving $8,506 per month; and

5

d.   CAIN's monthly benefit amount included A&A at the R-2 level with an effective date of August 6, 2014.

14.     Inquiries into CAIN's background revealed that CAIN served in the United States Army beginning in 1964. In February 1965, CAIN was struck by shrapnel in the buttocks area during combat in the Vietnam War. Following treatment, CAIN returned to active service and remained on active duty until he was honorably discharged in 1991 at the grade of E-9. Such service included deployment to Vietnam, and a second deployment to the Middle East with a Combat Engineering Unit during the Gulf War.

15.     From at least 2008 to the present, CAIN has made numerous representations to the VA that as a result of the February 1965 wound he has suffered various physical conditions and limitations, including loss of use of both legs, as well as loss of control of his bowels and bladder, so as to be 100% disabled and unable to work, unable to conduct daily activities such as dressing or bathing, and unable to defecate or urinate without assistance. The following paragraphs detail examples of specific representations CAIN made to the VA for consideration in determining his benefits.

16.     On July 27, 2011, CAIN signed a Statement in Support of Claim, VA Form 21-4138, under penalty of perjury, and submitted it by mail to the Winston-Salem VARO. In it, CAIN requested a service-connected rating and Special Monthly Compensation (A&A), saying that since at least September 2009 he had required medications and physical interventions by his wife to have bowel movements. CAIN attached several documents to his Statement, including a Supporting Statement purportedly from his wife, dated June 30, 2009, stating that CAIN's activities had been limited in the past year and a half, that he had back problems, trouble getting out of bed on his

6

own, trouble rising from a kneeling or seated position, and that "[g]etting up appears to be very painful for him and he gets around with the assistance of a walking cane."

17. On September 17, 2011, CAIN signed a Statement in Support of Claim, VA Form 21-4138, under penalty of perjury, and submitted it by mail to the Winston-Salem VARO. In it, CAIN reiterates his request for rating and A&A based on constipation, and adds that he was diagnosed with cauda equina syndrome[1] based on his 1965 combat injury. CAIN's Statement again includes various supporting documents, including a Supporting Statement purportedly from his wife, dated September 17, 2011, stating, "this letter is to verify the fact that I have to give aid to my Husband in order for him to have bowel movements." CAIN's ex-wife denies making the statement and denies that she ever assisted him in order for him to achieve a bowel movement.

18. On November 14, 2011, CAIN telephoned a VA call center in Columbia, South Carolina, and filed a claim for special monthly compensation for A & A based on bowel issues. The record of this phone call was sent to the Winston-Salem VARO for consideration in determining his disability benefits.

19. On March 7, 2012, CAIN was examined by a VA physician who completed VA Form 21-2680, Examination for Housebound Status or Permanent Need for Regular Aid and Attendance. The form was submitted to the Winston-Salem VARO for consideration in determining CAIN's disability benefits. On Form 21-2680, the physician noted the following:

---

[1] Cauda equina syndrome is a serious medical emergency, and compression of the nerves in the lower portion of the spinal canal causes it, and if left untreated it can lead to permanent loss of bowel and bladder control, parasthesia, and paralysis of the legs. https://www.emedicinehealth.com/cauda_equina_syndrome/article_em.htm (last accessed Oct. 23, 2019).

7

     a.     CAIN was seated upright in a wheel chair, which he can usually maneuver by himself, but relies on others for distances and inclines;

     b.     poor ability to walk distances; relies on wheelchair for most daily activity, but able to transfer from wheelchair to bed and can manage a few steps and use a walker for short distances (a few feet) in the home;

     c.     wife assists him at least three times per week with his bowel needs;

     d.     does not leave the home unless wife takes him;

     e.     relies on his wife to drive him to all his appointments and assist him with his wheelchair.

20.     On or about March 12, 2012, CAIN sent a letter to the Winston-Salem VARO, purportedly from his wife, in support of his benefits claim. The letter is nearly identical to one dated September 17, 2011 (*see* ¶17), and asserts she had to give him aid in order for him to have bowel movements, stating "...I would have to use gloves along with a small sterile spoon to help the movement." CAIN's ex-wife denies signing the letter and denies that she ever provided assistance of this nature to CAIN.

21.     On December 11, 2012, CAIN signed a Statement in Support of Claim, VA Form 21-4138, under penalty of perjury, and submitted it to the Winston-Salem VARO. The Statement provides in part, "I have loss [sic] control/use of two of my extremities that makes me helpless . . .. My wife dresses me and I have to be transported to and from my residence."

22.     On June 27, 2013, the VBA ruled on CAIN's disability claim. The rating included the decision to grant CAIN entitlement to a basic level of special monthly compensation under 38 U.S.C. § 1114, subsection (1) and 38 C.F.R. 3.350(b) on account of being so helpless as to be in

8

need of regular aid and attendance while not hospitalized at U.S. government expense, effective September 30, 2009. In making the decision, the VA considered statements from CAIN about his inability to control his bowels without the aid and assistance of his wife, his inability to walk more than a few steps inside his home, and his reliance on his wife to drive and accompany him outside their home. As a result of this Rating Decision, CAIN's monthly VA benefit increased from $3,073 to $3,761 (as of July 2013).

23.     On July 10, 2013, the VA paid CAIN a lump sum in the amount of $18,197.00 in retroactive benefits based on the increase in his disability rating. The money was deposited into CAIN's Pentagon Federal Credit Union checking account ending in 8021.

24.     On July 22, 2013, CAIN signed VA Form 21-0958, Notice of Disagreement, under penalty of perjury, objecting to the June 27, 2013 Rating Decision and requesting increased special monthly compensation for a higher level of A & A. As a basis for the disagreement, CAIN asserted that the Rating Decision was predicated on a need for bowel and bladder care three times a week, when in fact he required bowel and bladder care assistance daily.

25.     On September 9, 2013, CAIN signed a Statement in Support of Claim, VA Form 21-4138, under penalty of perjury, and submitted it to the Winston-Salem VARO. In it, CAIN requests assignment of a Decision Review Officer and reiterates his request for increased special monthly compensation for a higher level of A & A because "[my] bowel and bladder treatment . . . is actually every day."

26.     On April 9, 2014, the VBA issued another Rating Decision based on CAIN's disability claim. The decision granted CAIN entitlement, effective September 30, 2009, to a significantly higher level of special monthly compensation under 38 U.S.C. § 1114, subsection (1)

9

and 38 C.F.R. 3.350(b) on account of being so helpless as to be in need or regular aid and attendance. In making the decision, the VA considered statements from CAIN about his inability to control his bowels without the aid and assistance of his wife, his inability to walk more than a few steps inside his home, and his reliance on his wife to drive and accompany him outside their home. As a result of this Rating Decision, CAIN's monthly VA benefit increased from $3,817.42 to $8,330.25. The increase was due to the higher level of A&A, a health care benefit.

27. On April 28, 2014, the VA paid CAIN a lump sum in the amount of $218,313.32 for retroactive benefits based on the increase in his disability rating. The money was deposited into CAIN's Pentagon Federal Credit Union checking account ending in 8021. On September 18, 2019, I contacted David George at the Winston-Salem VARO, who confirmed the lump-sum payment to CAIN of $218,313.32 represented retroactive payment of A&A benefits pursuant to the Rating Decision dated April 9, 2014.

28. On October 8, 2014, CAIN signed VA Form 21-4502, Application for Automobile or Other Conveyance and Adaptive Equipment, under penalty of perjury. On the form, CAIN indicated he had a loss of use of both feet.

29. On October 23, 2014, CAIN signed VA Form 10-1394, Application for Adaptive Equipment Motor Vehicle, indicating he had a loss of use of both legs, above and below the knee.

30. On October 17, 2016, CAIN signed VA Form 10-1394, Application for Adaptive Equipment Motor Vehicle, indicating he had a loss of use of both legs, above and below the knee.

31. On December 14, 2018, CAIN signed an Application for Adaptive Equipment Motor Vehicle, VA Form 10-1394, but failed to indicate the nature of his qualifying disabilities.

10

32.     On February 12, 2019, CAIN signed VA Form 10-1394, Application for Adaptive Equipment Motor Vehicle, but again failed to indicate the nature of his qualifying disabilities.

CAIN's Background and Evidence His Claims are False

33.     Following his discharge from the United States Army, CAIN served as a police officer with the Fayetteville Police Department in Fayetteville, North Carolina, from 1992 until his retirement in 2007. During his service with the Fayetteville Police Department, CAIN served as a physical training officer, a firearms instructor, and a member of the Emergency Response Team.

34.     Following his retirement from the Fayetteville Police Department in 2007 to the present, CAIN has worked as a certified firearms instructor providing firearm instruction and concealed carry certification classes to paying customers.

35.     Following his retirement from the Fayetteville Police Department in 2007, until 2015, CAIN served as head of security for his church, such service requiring CAIN to conduct patrols of the church grounds during services.

36.     During the years 2009 to the present, CAIN has enjoyed an active life including working as a firearm and concealed carry instructor, enjoying beach activities, playing basketball, dancing, and conducting an active social life.

37.     On November 16, 2017, I reviewed digital photographic and video images I received from CAIN's estranged wife on November 15, 2017. I noted the following:

      a.  06.14.2009 depicts a still image of CAIN, wearing shorts and a football jersey, standing unassisted near a chair. The image was exposed on an unidentified beach

11

with what appears to be condominiums in the background;

   b.   DANCING JULY 2009.mov is a video segment showing CAIN dancing with a female identified as his wife.

   c.   DANCING2 JULY 2009.mov is a video segment showing CAIN dancing with a female identified as his wife.

   d.   FT FISHER JUNE 2009.mov is a very short video segment showing CAIN in the water at an unidentified beach.

   e.   FT FISHER2 JUNE 2009.mov is a video segment showing CAIN riding a boogie board in the surf. CAIN can be seen standing unassisted, waiting for waves, jumping on the board and riding the waves.

38.     On April 17, 2018, I received a series of email messages from CAIN's estranged wife who said she and CAIN had attended a 1970s themed birthday party the previous weekend in Fayetteville, NC. She provided a photograph of CAIN, standing and holding a cane, dressed in a purple costume with hat and sunglasses. She added the cane was for effect, as part of the costume.

39.     On June 4, 2018 and June 7, 2018, CAIN was recorded on at least six different cameras in and around the VA Medical Center, Richmond, Virginia (Richmond VAMC). The video includes images of CAIN entering the Richmond VAMC on a motorized scooter on June 4, 2018; and departing the Richmond VAMC on a motorized scooter on June 7, 2018.

40.     On May 25, 2018, CAIN arrived at the Fayetteville VA Healthcare Clinic (Fayetteville HCC) in an unidentified make and model van. CAIN exited the van in a motorized scooter, entered the main entrance of the Fayetteville HCC, approached a check-in station near the entrance, and continued his way in and around the Fayetteville HCC.

12

41. On October 16, 2018, I reviewed the Facebook page of the Fayetteville Police Department (FPD) and found photographs from an FPD breakfast event honoring FPD retirees. I viewed and saved five photographs depicting CAIN standing and walking unattended and unassisted at the event, which was held on October 15, 2018.

42. CAIN and his wife were divorced November 8, 2018.

43. On December 23, 2018, CAIN attended a Carolina Panthers football game at Bank of America Stadium in Charlotte, NC. I reviewed photographs of CAIN standing unassisted at the game.

44. I interviewed CAIN's ex-wife on October 17, 2017 and November 8, 2017 (before their divorce), and March 4, 2019. Over the course of these interviews, she made numerous statements relating to CAIN's health and needs, including the following:

   a. she never provided any assistance with feeding or bathing and refuted she ever assisted CAIN with any type of bodily waste elimination;

   b. CAIN was very self-sufficient in all his personal daily activities including feeding and bathing;

   c. CAIN had been seen by a spine specialist in Fayetteville, NC and she accompanied him to a training class about how to care for him if he ever needed assistance with bowel movements; however, she never had to actually assist CAIN. CAIN explained to her the training and equipment they received were precautionary for the event he might ever need her assistance;

   d. She denied she ever signed her name to, or submitted a letter to, the VA on CAIN's behalf;

13 .

e. CAIN had a motorized scooter but only used it when he had bowel and bladder appointments at the VA Spine Clinic. CAIN never used the scooter at their home;

f. She normally did not accompany CAIN to any of his appointments; however, CAIN emphasized her being with him at the bowel and bladder appointments at the spine clinic. He even wanted her to accompany him after she left their marital home in February 2017, but she refused;

g. I showed her a copy of a letter dated September 17, 2011, bearing her signature. She stated she could tell that it was written by CAIN, and that she did not author or sign the letter. She explained she recognized the signature as being from a stamp she had purchased for use for her janitorial business. She said she did not give CAIN permission to use the stamp. She stated the content of the letter was not true; adding the only part that was true was about her receiving a briefing about how to assist CAIN with bowel movements if it became necessary. She added that she never actually had to help CAIN in that way; and

h. CAIN never had an outside caregiver stay in their home.

45. On March 14, 2019, I spoke with Alex Heineman, a Sales Associate at Jim's Pawn Shop, 4632 Yadkin Road, Fayetteville, NC, regarding CAIN's activity at the indoor shooting range inside Jim's Pawn Shop. Heineman readily recognized a photograph of CAIN, stating, "Oh yeah, [he comes in] all the time. Comes in with his church." Heinemann said CAIN had a membership at the range. Heinemann researched the range's records and provided invoices from March 5, 2018 to February 19, 2019, for each instance CAIN used the range. The records Heinemann provided show that CAIN purchased an annual membership on March 5, 2018 for $225; that CAIN

14

was at Jim's Pawn Shop at least 19 times between March 5, 2018 and February 19, 2019; that the average time CAIN spent at the ranges was about 40 minutes; and that he typically had at least one guest with him.

46.     On March 14, 2019, I interviewed Michael C. Hines, Administrator, Kingdom Impact Global Ministries (KIGM), 2503 Murchison Road, Fayetteville, NC, regarding CAIN. Hines acknowledged CAIN had been a long-time member of KIGM since sometime before 2009. Hines said CAIN was the head of security for KIGM from 2009 until he resigned on May 3, 2015. Hines said CAIN prepared the KIGM Security Standard Operating Procedures (SOP) and oversaw the implementation of the SOP. Hines said CAIN continued some training even after he resigned.

47.     On March 21, 2019, I interviewed CAIN's ex-father-in-law, who stated he had known CAIN for about fourteen years and had never seen him use any assistive device, nor complain about having any disability requiring any special assistance to carry out his daily living activities.

48.     On April 25, 2019, I reviewed records received from the North Carolina Department of Justice pertaining to the Concealed Carry Handgun Instructor (CCHI) qualifications of CAIN.    The information indicated CAIN applied for and received his North Carolina CCHI certification in 2005, renewed it every year, and ordered a total of 200 CCHI Certificates between December 8, 2011 and January 13, 2017.  The instructor issues the certificates to individuals who successfully complete the concealed carry course, indicating CAIN trained a large number of individuals in concealed carry procedures. The training requires both oral presentations, and hands-on training and range time with each applicant.

49.     On June 25, 2019, I interviewed a physician (Doctor 1) at the Fayetteville VAMC

15

whose treatment of CAIN dated back to 2012. I showed Doctor 1 photographs and video of CAIN obtained during this investigation. Doctor 1 stated the images were in stark contrast to the way CAIN presented during their medical appointments.

50.    On June 26, 2019, I interviewed a physician (Doctor 2) at Fayetteville HCC who identified as CAIN's primary care provider; however, Doctor 2 added that because CAIN's SCI (spinal cord injury) issues were being followed by another physician, Doctor 2 did not focus on CAIN's ambulatory needs. I showed Doctor 2 photographs and video of CAIN obtained during this investigation. Doctor 2 stated CAIN would not be expected to be able to perform most of the activities documented during this investigation.

51.    On June 27, 2019, I obtained recent video images of CAIN captured by security cameras at the Carolina Beach Parks and Recreation Center.

    a.    In video footage dated June 10, 2019, CAIN can be seen entering the facility at 9:51 followed by a younger male believed to be a relative. Both are wearing long shorts and t-shirts. CAIN stands erect and walks without any perceptible difficulty and with no assistive devices. Video footage from the indoor basketball court time-stamped approximately 45 minutes later shows CAIN playing basketball with the younger male. CAIN can be seen dribbling the basketball, running, and jumping, apparently playing a game of "one on one" with the young man.

    b.    In video footage dated June 12, 2019, CAIN can be seen entering the facility at 11:13:01, again followed by a young man. Both are wearing long shorts and t-shirts. CAIN stands erect and walks without any perceptible difficulty and with no assistive devices. CAIN checks in at the front desk and at 11:13:41 he and the

16

younger male depart the reception area. Video footage from the indoor basketball court shows CAIN entering the basketball court at 11:13:47. Thereafter, CAIN can be seen dribbling the basketball, running, and jumping, and dribbling behind his back and jogging after missed shots. CAIN and the younger male are still active on the court when the video segment ends at 11:29:59.

## CAIN's VA Benefits

### Disability, A&A Benefits

52.    The Rating Decision on April 9, 2014, effectively increased CAIN's monthly disability and A&A benefits to the highest level available to veterans. From December 2018 to present, for example, CAIN's gross monthly benefit was $8,919.54, which includes approximately $5,583.39 per month in A&A. From December 2017 to November 2018, CAIN's gross monthly benefit was $8,676.60, including approximately $5,431.32 per month in A&A. (Note: These amounts do not include CAIN's military retirement benefit.)

### VA Automobile Allowance and Adaptive Equipment Grants

53.    The VA Automobile Allowance (VAAA) is a one-time grant available to veterans who buy a new or used vehicle and have specified service-connected disabilities including but not limited to loss, or permanent loss of use, of one or both feet. The grant is paid directly by the VA to the seller of the automobile. CAIN qualified for the VAAA based on his claim that he had lost the use of his legs. In 2014, the maximum amount of the VAAA was $20,114.34.

54.    The VA Automobile Adaptive Equipment Grant (AAEG) is available to those veterans who qualify for the VAAA and suffer from joint immobility of the knees or hips, which is a result of military service. Adaptive equipment includes, but is not limited to, power steering,

17

power brakes, power windows, power seats, and special equipment necessary to assist the eligible person into and out of the vehicle. The AAEG may be paid more than once, and may be paid to the vendor providing or installing adaptive equipment or to the veteran to reimburse the cost of certain optional equipment.

55.     CAIN applied for a VAAA on October 8, 2014, representing under penalty of perjury that he had a loss of use of both feet. (*See also* ¶28). The application was approved, and on November 21, 2014, VBA sent a U.S. Treasury Check for $20,114.34 to Van Products, Incorporated, Raleigh, North Carolina (Van Products). This check was the disbursement of a VAAA for the purchase of a 2014 Toyota Sienna VIN 5TDYK3DCXES497128 (Vehicle 1) for CAIN.

56.     In connection with the purchase of Vehicle 1, CAIN applied for an AEG, indicating he had a loss of use of both legs, above and below the knee. (*See also* ¶29). The application was approved, and on December 31, 2014, the Finance Processing Center in Winston-Salem, NC paid $3,101.65 to CAIN to reimburse him for the estimated cost of certain optional equipment under Chapter 39; and on January 14, 2015, the Finance Processing Center paid $30,000 to Van Products for the installation of adaptive equipment on Vehicle 1.

57.     On October 17, 2016, CAIN traded Vehicle 1 for a 2016 Toyota Sienna, VIN 5TDYK3DC5GS697952 (Vehicle 2) at Van Products. CAIN paid the balance due of $1,030 with check number 1120 drawn on CAIN's PenFed Credit Union checking account.

58.     In connection with the purchase of Vehicle 2, CAIN applied for an AEG, indicating he had a loss of use of both legs, above and below the knee. (*See also* ¶30). The application was approved, and on November 13, 2016, the Finance Processing Center in Winston-Salem, NC paid

18

$3,113 to CAIN to reimburse him for the estimated cost of certain optional equipment under Chapter 39; and on November 14, 2016, the Finance Processing Center paid $28,110 to Van Products for the installation of adaptive equipment on Vehicle 2.

59. On December 14, 2018 CAIN traded Vehicle 2 for a 2018 Toyota Sienna, VIN 5TDYK3DC3JS965691 (Vehicle 3) at Van Products. The Bill of Sale shows no balance due after the trade-in and other discounts.

60. On December 14, 2018, CAIN again applied for an AEG, but failed to indicate the nature of his qualifying disabilities on VA Form 10-1394. (*See also* ¶31). The application was approved despite the omission, and the Finance Processing Center in Winston-Salem, NC paid $31,025.00 to Van Products on January 25, 2019, for the installation of adaptive equipment on Vehicle 3, and paid $3,445 to CAIN on January 31, 2019, to reimburse him under Chapter 39 for the estimated cost of certain optional equipment on Vehicle 3.

61. On February 12, 2019, CAIN again applied for an AEG, but failed to indicate the nature of his qualifying disabilities on VA Form 10-1394. (*See also* ¶32). The application was approved despite the omission, and on April 29, 2019, the Finance Processing Center in Winston-Salem, NC paid $4,150.00 to Van Products for the purchase and installation of a 6-way power seat on Vehicle 3.

Specially Adapted Housing Grant

62. A Specially Adapted Housing (SAH) grant is available to service members and veterans with certain permanent and total service-connected disabilities to help purchase or construct an adapted home or modify an existing home to accommodate a disability. CAIN became eligible for the SAH grant as a result of the findings in the Rating Decision dated April 9,

19

2014.

63.     CAIN has received SAH grant funds in the total of $85,645 ($70,465 in 2016 and $15,180 in 2018) to fund additions and modifications to his residence in Fayetteville.

Additional benefits

64.     On or about January 18, 2013, the VA initiated the purchase of a motorized wheelchair for CAIN's use at a cost of approximately $1,094.95. The device was purchased by VA from Golden Technologies, which describes it as a Companion GC340 motorized scooter.

65.     On or about December 2, 2014, VA paid a total of approximately $8,158.49 for the purchase and installation of a vertical platform lift at CAIN's residence in Fayetteville, NC.

## CAIN's Bank Accounts: Analysis and Tracing

66.     I have reviewed bank records for a number of accounts in the name of Willie D. CAIN, including accounts at Pentagon Federal Credit Union (PenFed) for the period from December 25, 2010, to September 25, 2019. Only those accounts significant to this Affidavit are discussed below.

67.     *PenFed Checking Accounts.* From the beginning of the period reviewed until at least February 25, 2017, CAIN had a "PenCheck Plus" checking account ending in 8021. On January 31, 2017, he opened an "Access America" checking account ending in 5024 and transferred the balance of account 8021 ($89,151.94) to account 5024. All of CAIN's VA benefits were electronically deposited to his checking account ending in 8021 until January 31, 2017, and thereafter to the successor checking account ending in 5024. Similarly, CAIN's military retirement, social security benefits, and state retirement payments are electronically deposited to his checking account.

20

68.     *PenFed Savings Accounts.* From the beginning of the period reviewed until at least February 25, 2017, CAIN had a Money Market Savings account ending in 7038. On January 31, 2017, he opened a new Money Market Savings account ending in 8036 and transferred the balance of account 7038 ($109,540.89) to account 8036. Account 7038 remains open but has had little activity and has a balance of less than $2500. With the exception of the January 31, 2017 transfer, CAIN's Money Market Savings accounts (original and successor) were funded almost exclusively by transfers from his PenFed checking accounts.

Seizure from PenFed Checking Account 5024

69.     Between November 26, 2018 and October 31, 2019, the VA made the following benefit payments to CAIN's PenFed checking account ending in 5024:

| | |
|---|---|
| Oct-19 | 8592.21 |
| Sep-19 | 8592.21 |
| Aug-19 | 8592.21 |
| Jul-19 | 8592.21 |
| 6/19/2019 | 8592.21 |
| 5/29/2019 | 8592.21 |
| 4/29/2019 | 8592.21 |
| 3/29/2019 | 8592.21 |
| 2/27/2019 | 8592.21 |
| 1/30/2019 | 8488.96 |
| 12/28/2018 | 8488.96 |
| 11/26/2018 | 8246.02 |
| | |
| TOTAL | 102553.83 |

Based on information and analysis provided by David George, Winston-Salem VARO, CAIN's gross benefits for this period included A&A benefits in the amount of $66,848.61. As shown by the investigation described in this Affidavit, these payments were granted by the VA based on false statements CAIN made to the Winston-Salem VARO, and are therefore subject to seizure

21

and forfeiture.

70.     I am advised that Title 18, United States Code, Section 984 allows the United

States to seize for civil forfeiture identical property found in the same place where the

"guilty" property had been kept.  I am advised that, pursuant to Section 984(a)(1)(b),

therefore, this Affidavit need not demonstrate that the monies now in the PenFed account

ending in 5024 in the name of Willie D. CAIN are the particular monies involved in the

offense, so long as the forfeiture is sought for other funds on deposit in that same account.

71.     I am further advised that the "fungibility" rule of Section 984(b) cannot reach back

in time for an unlimited period.  Section 984(b) provides:

> No action pursuant to this section to forfeit property not traceable directly
> to the offense that is the basis for the forfeiture may be commenced more
> than one year from the date of the offense.

72.     I am advised that, while Section 984 does not explicitly term "action," the section's

legislative history clearly establishes that Congress intended the seizure of property to constitute

the "action" to be commenced within one year of the offense in order to obtain the benefit of the

application of that section's fungibility rule:

> Section 984 provides that in cases involving fungible property, property is
> subject to forfeiture if it is identical to otherwise forfeitable property, is located
> or maintained in the same way as the original forfeitable property, and not more
> than one year has passed between the time the original property subject to
> forfeiture was so located or maintained and the time the forfeiture action was
> initiated by seizing the property or filing the complaint, regardless of whether
> or not the fungible property was continuously present or available between the
> time it became forfeitable and the time it was seized.

Money Laundering Enforcement Amendments of 1991, H.R. Rep. No. 102-28 (March 20, 1991).

22

73. Accordingly, I am only requesting a seizure warrant for funds on deposit up to and including the amount of $66,848.61 from the PenFed Access America checking account ending in 5024 in the name of Willie D. CAIN.

## Seizure from PenFed Money Market Savings Account

74. I understand that funds in CAIN's Money Market Savings account are subject to seizure and forfeiture to the extent they are traceable to the offenses described in this Affidavit. Where, as here, legitimate funds are commingled with fraud proceeds in a bank account, tracing rules allow courts to distinguish between legitimate and illegitimate funds and to track or trace the movement of illegitimate funds.

75. I further understand that in a civil forfeiture action, these tracing rules, including (1) the "lowest intermediate balance" rule; (2) the "averaging" rule; and (3) the "drugs-in, first-out" rule. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir. 1986). The Lowest Intermediate Balance Rule originated in trust law as a rule to determine the rights of a trust beneficiary to a trustee's bank account where the trust funds and the trustee's personal funds are commingled. The Rule assumes that the funds at issue remain in the account and are available to be traced provided that the balance does not fall below the amount of the disputed funds. By contrast, the "averaging" rule considers a pro rata share of each withdrawal or asset purchased to be "traceable proceeds." *Banco Cafetero*, 797 F.2d at 1159. And the third, "drugs-in, first-out," approach considers any one withdrawal or an asset purchased with one withdrawal to be "traceable proceeds," to the extent of the amount of the criminal proceeds in the bank account. The Fourth Circuit applied the first rule—the Lowest Intermediate Balance Rule (LIBR)— in *United States v.*

23

*Miller*, 911 F.3d 229, 234 (4th Cir. 2018) (Applying to LIBR without citing to *Banco Cafetero*).

76.     CAIN received two material lump-sum retroactive benefit payments, as previously

mentioned, and almost immediately transferred a portion of those benefits to his savings accounts:

> a.     On July 10, 2013, the VA deposited $18,197.00 into CAIN's Pentagon
> Federal Credit Union checking account ending in 8021. On July 15,
> 2013, CAIN transferred $9,000.00 of this amount to his savings account
> ending in 7038;
>
> b.     On April 28, 2014, the VA paid CAIN a lump sum in the amount of
> $218,313.32, deposited into CAIN's PenFed checking account ending
> in 8021. Prior to the deposit the account had a balance of only
> $3,728.13. On May 13, 2014, CAIN transferred $100,000 to his savings
> account ending in 7038.

77.     Applying LIBR to CAIN's PenFed savings accounts, the lowest intermediate

balance in account 7038 following the deposit on July 10, 2013, was more than $9,000, and the

lowest balance after the deposit April 28, 2014, was $106,228.17. The balance in account 7038

($109, 540.89) was transferred to account 8036 on January 31, 2017, and the lowest intermediate

balance in account 8036 following the transfer was $102,487.50 on January 22, 2018.

78.     Accordingly, I am only requesting a seizure warrant for funds on deposit up

to and including the amount of $102,487.50 from the PenFed Money Market Savings

account ending in 8036 in the name of Willie D. CAIN.

## APPLICABLE FORFEITURE PRINCIPLES

79.     I understand that property subject to civil forfeiture may be seized pursuant to 18

U.S.C. § 981(b), and property subject to criminal forfeiture may be seized pursuant to 21 U.S.C. §

853(f). In cases where the Government is not certain at the time of the seizure if it will pursue

civil or criminal forfeiture, courts may issue the seizure warrant under both statutes. The probable

24

cause showing is the same for Sections 981(b) and 853(f), except that the latter also requires a showing that a restraining order "may not be sufficient to assure the availability of the property for forfeiture."

80.    An order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture because there is reason to believe that the property is in the custody of the defendant, who cannot reasonably be relied on to abide by an order to maintain the property in substantially the same condition as it is at the present time in order that it will be available for forfeiture. Furthermore, based on my training and experience I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.

81.    I expect that some or all of the property subject to seizure may be found outside the Middle District of North Carolina. Section 981(b)(3) of Title 18, United States Code, explicitly provides jurisdiction for the issuance of seizure warrants for property located in other districts. This statute provides as follows:

> Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

25

Issuance of the seizure warrant in this district is appropriate under the above statute, as this is the district "in which ... the acts or omissions giving rise to the forfeiture occurred," 28 U.S.C. § 1355(b)(1)(A). As provided in 18 U.S.C. § 981(b)(3), the warrant may be "executed in any district in which the property is found."

## CONCLUSION

82.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the properties described in paragraph 4 above constitute or are derived from proceeds traceable to the commission of a Federal health care offense or other "specified unlawful activity" (as defined in 18 U.S.C. §1956(c)(7) (including violations of 18 U.S.C. §§ 1347 and 641)), and are therefore subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1(C) and 982(a)(7).

83.     Based on the foregoing I respectfully request that this Court issue seizure warrants for the properties described in paragraph 4 above.

This the 29th day of October, 2019.

George Earl Boyles
Special Agent
United States Department of Veteran Affairs
Office of Inspector General

Sworn to and subscribed before me
this 29th day of October, 2019.  1:45 pm

Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

26